Bartlett and another vs. Collins.

---

BARTLETT and another, Respondents, vs. COLLINS, Appellant.

*February 2 — March 19, 1901.*

*Contracts: Conflict of laws: Public policy: Gambling: Sale of grain on board of trade: Rules of board: Special verdict: Instructions to jury: Burden of proof.*

1. If a personal contract is to be performed partly where made and partly in other countries or states, the law of the place where it is made will govern, unless a clear mutual intention is manifested that it shall be governed by the law of some other country.
2. A contract, made in this state between residents thereof, by which one employed the other, a broker, to sell wheat for him in Chicago and agreed to pay a commission for such service and to indemnify the broker against loss, is governed by the law of this state.
3. The courts of this state will not hold valid any contract which is injurious to the public rights of its people, offends their morals, contravenes their policy, or violates public law.

Bartlett and another vs. Collins.

4. One who employs a broker to make a sale for him on a board of trade impliedly submits himself to the lawful rules of such board.

5. Where a case is submitted to the jury for a special verdict, it is error to give instructions applicable only to a general verdict.

6. To uphold a time contract for the sale and delivery of grain upon a board of trade, it must affirmatively and satisfactorily appear that it was made with an actual view to the delivery and receipt of the grain, and not as a cover for a gambling transaction. *Barnard v. Backhaus*, 52 Wis. 593, followed. CASSODAY, C. J., and DODGE, J., dissent.

7. The rule as to burden of proof, laid down in *Barnard v. Backhaus*, 52 Wis. 593, was not changed by the subsequent enactment of sec. 2319a, Stats. 1898.

APPEAL from a judgment of the circuit court for Sheboygan county: MICHAEL KIRWAN, Circuit Judge. *Reversed.*

The plaintiffs, who are grain commission merchants in the city of Milwaukee, brought this action against the defendant to recover upon open account for moneys advanced and services performed for the defendant in July and August, 1897. The account is set forth in the complaint as follows:

E. C. Collins, in account with Leman Bartlett & Son,

Dr.

| | | | |
|---|---|---|---|
| August 19th, 1897. | To 2,000 bu. wheat at $.89½ | | $1,782 50 |
| " | To commission | | 2 50 |
| Total | | | $1,785 00 |

Credit.

| | | | |
|---|---|---|---|
| July 30th, 1897. | By 1,000 bu. wheat sold at $.75½ | $755 00 | |
| Aug. 3rd, 1897. | By cash received | 30 00 | |
| Aug. 6th, 1897. | " " " | 50 00 | |
| Aug. 6th, 1897. | By 1,000 bu. wheat sold at $.78¼ | 782 50 | |
| Total | | | $1,617 50 |
| Balance due | | | $167 50 |

The answer, after setting forth a general denial of the complaint, alleges that the transactions between the parties were gambling transactions, and void under the statutes; that all of the contracts made by the plaintiffs with the defendant by which the plaintiffs undertook to buy and sell

wheat for the defendant were made without intending either to receive or deliver grain, but wholly to wager in the market price of wheat at the Chamber of Commerce in the city of Chicago, intending only to pay or receive the difference between the price and the market rate, whatever the same should be. It appeared in the evidence that the defendant, *Collins*, resided at Plymouth, Wisconsin, and that his business was farming and buying grain; that on the 30th of July, 1897, he telephoned to the plaintiffs and told them to sell for him 1,000 bushels of December wheat, Chicago delivery; that on August 6th the defendant directed the plaintiffs to sell another 1,000 bushels of December wheat, Chicago delivery; that the plaintiffs made both sales upon the Chicago Board of Trade through their Chicago agents, the first being made at $.75½, and the second at $.78¼. No wheat was actually delivered on either of these sales. The price of wheat advancing, the plaintiffs immediately began to require the deposit of margins by *Mr. Collins*, and on August 3d the defendant sent $30, and on August 6th $50, in response to such demands. After the 6th of August *Mr. Collins* failed to send any further margins, and on the 19th of August the plaintiffs bought in 2,000 bushels of December wheat at $.89⅓ and closed the transaction. No wheat was actually delivered upon these purchases. The trade was claimed to be closed up under certain rules of the Chicago Board of Trade, which were offered in evidence and received under objection, which rules, the plaintiffs claim, authorized the closing up of trades upon failure to deposit sufficient margins in the manner as was done in this case.

The defendant's claim was that the whole transaction was a gambling transaction; that there was no intent either on the part of himself or of the plaintiffs to deliver a single bushel of wheat. The laws of the state of Illinois upon the subject were not introduced in evidence. The court instructed the jury, among other things, that the defendant

had the burden of proof to satisfy them by the greater weight of evidence that both parties intended to make a gambling or wagering contract, to which instruction the defendant duly excepted.

A special verdict was returned, in which it was found, in answer to appropriate questions, that both the plaintiffs and the defendant in good faith intended and expected an actual delivery of wheat under the two sales, and that the plaintiffs' damages were $182.53. From judgment in accordance with this verdict the defendant appeals.

*M. C. Mead,* for the appellant.

For the respondents there was a brief by *Moe & Hansen,* and oral argument by *Otto Hansen.*

WINSLOW, J. This is an action by brokers to recover of their principal their commissions and moneys advanced by them in selling grain for the principal. Both brokers and principal reside in this state, and the verbal order or commission given by the principal was given in this state, and any liability resulting from the contract on the part of the principal was evidently to be discharged in this state. It was contemplated, however, by both parties that the transaction in grain, whether a real one or only a speculative one, should take place in Chicago. This is certain, because the plaintiffs so testify, and the defendant by his answer alleges that the intention was to wager in the market price of wheat at the Chamber of Commerce in Chicago.

The question whether this contract was an Illinois contract or a Wisconsin contract is an important one in the case, but it has received little attention in the briefs, although the plaintiffs claim that a verdict should have been directed in their favor, because the sale of the wheat was to be made, and in fact was made, in Chicago, and the laws of Illinois with respect to gambling transactions were not introduced in evidence. It does not clearly appear what view the trial

judge took of the question, although he instructed the jury, in accordance with the law of this state, in effect, that if both parties intended the transaction to be a mere wagering contract on the price of wheat, without intention to deliver the wheat, but simply to settle by payment or receipt of differences, then the contract was void. Stats. 1898, sec. 2319*a; Wall v. Schneider*, 59 Wis. 352. Whether this instruction was based on the idea that the contract was a Wisconsin contract and governed by Wisconsin law, or that, if it was an Illinois contract, then that the law of Illinois would be presumed, in the absence of proof, to be the same as the law of Wisconsin, is not apparent. If it was an Illinois contract, it would seem at least extremely doubtful whether any presumption would be entertained that the law of Illinois was the same as the law of Wisconsin on the subject. It has been held by this court (*Hull v. Augustine*, 23 Wis. 383) that such a presumption will not be indulged as to a statute imposing a penalty or a forfeiture, as in the case of usury laws. But, however this may be, we are of the opinion that the contract between plaintiffs and defendant was a Wisconsin contract, though the sale of grain was to be made in Chicago.

The question as to what law is to govern a contract is not always an easy one to decide. As a general rule the construction and validity of a purely personal contract depend on the law of the place where made. Story, Conflict of Laws, § 272. If, however, the contract is made in one place, to be performed in another, then, as a general rule, the place of payment or performance is the place of the contract. 2 Parsons, Cont. (8th ed.), 583; *Newman v. Kershaw*, 10 Wis. 333. This rule is founded on the idea that, in making a personal contract to be fully performed in another state, the parties must have had the law of that other state in view. *Shores L. Co. v. Stitt*, 102 Wis. 450. But if the contract is to be partly performed where made, and partly

in other countries or states, the law of the place where it is made will still govern, unless a clear mutual intention is manifested that it shall be governed by the law of some other country. *Liverpool & G. W. S. Co. v. Phenix Ins. Co.* 129 U. S. 397. Thus, it was held in *Morgan v. N. O., M. & T. R. Co.* 2 Woods, 244, that, where a contract was made in one state to be partly performed there and partly performed in several other states, the contract, so far as it is personal in its nature, was to be governed by the law of the state where it was made. In the present case, the contract in question is the brokerage contract by which the defendant employed the plaintiffs to sell wheat for him in Chicago, and agreed to pay the plaintiffs their commissions for such service and indemnify them against loss. Both parties lived in Wisconsin, and the contract was made here. It is true that one act under the contract was to take place in Illinois, but all other acts, including the payment by the principal of all obligations incurred to his agents, were manifestly to take place in Wisconsin. Under the rules stated, it seems certain that it should be held to be governed by the law of Wisconsin.

But even were it held to be an Illinois contract, it is not seen how the result would be different. It is a universal principle that the courts of no state will hold valid any contract which is injurious to the public rights of its people, offends their morals, contravenes their policy, or violates a public law. 2 Kent, Comm. (14th ed.), 458, and cases cited in note " d." So, in either event, if the alleged sale of the grain was in fact no sale, but only a gambling transaction, and so intended by both parties, then the contract before us can be the foundation of no rights in our courts.

Certain rules of the Chicago Board of Trade were received in evidence against defendant's objection, and this ruling is now assigned as error. It is unnecessary to recite the rules at length, but it is sufficient to say that they pur-

port to give to members of the board, whether buyers or sellers, the right to demand of the other party to such sale or purchase the deposit of ten per cent. as security, and further security from time to time as the market price of the commodity sold varies, and also the right of resale or repurchase in case of failure to deposit the security as demanded. It is sufficient to say with regard to this ruling that we think sufficient foundation was laid for the reception of the evidence. The plaintiffs, by their agents, offered testimony to show that the understanding was that the sale was to be made on the Chicago Board of Trade. The answer of the defendant, while claiming that the transaction was intended to be a gambling transaction, specifically alleges that it was to be a wager on prices of wheat at the Chicago Chamber of Commerce, which, we suppose, refers to the same institution as the Board of Trade. It is entirely clear that if the trade, whether real or speculative, was authorized to be made on the Board of Trade, it was intended to be made pursuant to the rules of such Board. The party who authorizes such a transaction to be made under the auspices of a particular organization, like a board of trade, impliedly submits himself to the lawful rules of the organization.

The court charged the jury, in effect, that the defendant had the burden of proof to show by the greater weight of evidence that both parties intended the transaction to be a gambling or wagering contract, and unless he did so the defense failed; and to this instruction the defendant excepted.

The instruction was erroneous for two reasons: first, it was an instruction applicable only to a general verdict, and the case was submitted to the jury upon a special verdict; second, it is contrary to the rule laid down in *Barnard v. Backhaus*, 52 Wis. 593. In that case it was held that, to uphold such a contract (i. e. a time contract for the sale and

delivery of grain upon a board of trade), it must affirmatively and satisfactorily appear that it was made with an actual view to the delivery and receipt of the grain, and not as a cover for a gambling transaction. This rule has not been departed from, so far as we can ascertain, in this court. It is not, in our judgment, unreasonable. It is based on the well-known fact that a very large majority of the transactions on such boards are not real transactions, but simply betting on future prices. The reasons for the rule are closely analogous to those which sustain the well-known rule that where voluntary transfers of property are made by aged persons to one occupying a position of trust and confidence, under circumstances of secrecy, the burden is upon the grantee to show that the transaction was free from fraud. *Doyle v. Welch,* 100 Wis. 24. We are aware that many courts do not approve this rule, but it has been definitely approved by respectable courts. *Sprague v. Warren,* 26 Neb. 326; *Cobb v. Prell,* 15 Fed. Rep. 774; *Wheeler v. McDermid,* 36 Ill. App. 179.

It has been suggested that the statute (sec. 2319a, Stats. 1898) which was passed after the decision in *Barnard v. Backhaus* has changed the rule, but we have discovered no words in that statute which indicate an intention to change the rule of evidence. It would have been very easy to express such intention in unmistakable terms if it existed.

For the error in this instruction there must be a new trial. It does not seem necessary to discuss other errors alleged.

*By the Court.*— Judgment reversed, and action remanded for a new trial.

CASSODAY, C. J. I concur in the reversal of this judgment, but solely on the ground that an instruction applicable to a general verdict was given, whereas the case was submitted to the jury on a special verdict, contrary to the rule as held in *Ward v. C., M. & St. P. R. Co.* 102 Wis. 215, and subse-

quent cases. I cannot concur, however, in the proposition that the trial court committed an error in charging the jury to the effect that the burden of proof was upon the defendant to satisfy them by the greater weight of evidence that both parties intended to make, and did make, a gambling or wagering contract by and through the transactions in question.

It is conceded in the opinion filed that the contracts were valid, unless both parties intended the transactions to be mere wagering contracts on the price of wheat, without intending to deliver the same, but simply to adjust the differences by payments or receipts; citing *Wall v. Schneider*, 59 Wis. 352. The s ections of the statutes referred to in that case are highly penal. Secs. 4424, 4425, 4532, 4535, 4538, Stats. 1898. They not only render all wagering contracts void, but punish the offending parties and authorize the recovery back of the money paid thereon. So far as I am aware, the rule is universal that a party seeking to bring a given transaction with the opposite party under the condemnation of such penal statutes has the burden of proving it. The principle is stated by Lord Chief Justice Coke as follows: "It is a general rule that whensoever the words of a deed, or of the parties without deed, may have a double intendment, and the one standeth with law and right, and the other is wrongful and against law, the intendment that standeth with law shall be taken." 1 Co. Litt. 42b. So in this country it is held to be "a rule of interpretation that where a contract is fairly open to two constructions, by one of which it would be lawful and the other unlawful, the former must be adopted." *Hobbs v. McLean*, 117 U. S. 576, and numerous authorities there cited. The same rule has been applied to alleged wagering contracts. *Bigelow v. Benedict*, 70 N. Y. 205.

The latest edition of the American & English Encyclopedia of Law states the rule thus: "(3) The real test whether

the ostensible contract is or is not a gambling contract is a question of fact, and, if the evidence is conflicting, it is for the jury, under proper instructions from the court, to determine. (4) The burden of proof in actions on these contracts is upon the party alleging that the transaction is illegal and a gambling contract." 14 Am. & Eng. Ency. of Law (2d ed.), 618. In support of such proposition numerous cases are cited from seventeen different states, besides several from the federal courts. I have only examined a few of them, but those and others I have examined support the text.

Thus, it is held that, "in the absence of evidence to the contrary, it will be presumed that the contract was made in good faith, with intent on the part of both parties to perform." *Bigelow v. Benedict,* 70 N. Y. 202. To the same effect is *Story v. Salomon,* 71 N. Y. 420, 422, where it is said: "We may guess that the parties were speculating upon the fluctuations in the price of the stock, and that the defendant was not to be required to take or deliver any stock in any case, but simply to pay differences. But a contract which can have legal interpretation and effect should not be condemned without any proof, in that way. To the same effect, *Harris v. Tumbridge,* 83 N. Y. 93. So it has been held in Alabama that where, "by the terms of the contract, defendant agreed to deliver the stock, and plaintiff agreed to accept a delivery, the contract is *prima facie* valid, and the defendant on whom rests the burden of proof has failed to show any understanding or intent that there should be no delivery." *Perryman v. Wolffe,* 93 Ala. 291. So, in Missouri, it is held that "the burden of showing the invalidity of the contract rests upon the party asserting it." *Crawford v. Spencer,* 92 Mo. 498, 502. So, in New Jersey, it is held that "the burden of proving that transactions relating to the purchase and sale of stocks which are in form transactions between the customer, as principal, and the broker, as agent, are wagering contracts, *rests on the party* asserting

Bartlett and another vs. Collins.

their illegality." *Pratt v. Boody*, 55 N. J. Eq. 176. To the same effect, *Beadles v. McElrath*, 85 Ky. 230, 238. So, it has been held in Illinois that "where the maker of a promissory note seeks to avoid the same on the ground that its consideration was illegal, the burden of proof is upon him to show the fact by a clear preponderance of the evidence." *Pixley v. Boynton*, 79 Ill. 351. That case related to a transaction on the board of trade. To the same effect is *Scanlon v. Warren*, 68 Ill. App. 213, affirmed in 169 Ill. 142. See, also, *Gaw v. Bennett*, 153 Pa. St. 247, 255. Thus, in Minnesota it is held that "the burden of establishing the illegality of such transactions rests upon the party who asserts it." *Mohr v. Miesen*, 47 Minn. 228. See, also, *Rountree v. Smith*, 108 U. S. 269, 276; *Irwin v. Williar*, 110 U. S. 499, 507, 510; *Bibb v. Allen*, 149 U. S. 492. In these cases it is held by the highest court in this country to be "well settled that the burden of proof is upon the party who seeks to impeach such transactions by showing affirmatively their illegality." In my judgment, there is no well-considered case holding a contrary rule.

But it said that this court is committed to a contrary ruling in *Barnard v. Backhaus*, 52 Wis. 593. That case was decided a few months before I became a member of the court, and a memorandum of the decision was made by the late Chief Justice RYAN, but he died before writing an opinion, and no opinion was written until a year afterwards. The syllabus to that case is, to my mind, misleading. It may be inferred from it that a contract for the sale and future delivery of grain, for a price certain, is presumptively a wagering contract. But that is contrary not only to the memorandum filed, but also to the opinion in the case; for it is declared in both that such contract, made with the "*bona fide* intention to deliver," is valid. To that statement the opinion by Chief Justice COLE adds: "Such contracts are constantly made in legitimate transactions, and are unob-

Bartlett and another vs. Collins.

jectionable in law." Page 598. It is then said in the memorandum: "But when such contracts are made as a cover for gambling, without intention to deliver and receive the grain, but merely to pay and receive the difference between the price agreed upon and the market price at such future day, they come within the statute of gaming, and are void in law. To uphold *such a contract* it must affirmatively and satisfactorily appear that it was made with an actual view to the delivery and receipt of the grain, and not as an evasion of the statute of gaming, or as a cover for a gambling transaction." Page 597. In neither of the three cases cited by Chief Justice COLE do we find anything to support the alleged presumption of illegality. On the contrary, he quotes approvingly from the Pennsylvania case the following: "We must not confound gambling, whether it be in corporation stocks or merchandise, with what is commonly termed 'speculation.' Merchants speculate upon the future prices of that in which they deal, and buy and sell accordingly. In other words, they think of and weigh — that is, speculate upon — the probabilities of the coming market, and act upon this lookout in the future in their business transactions; and in this they often exhibit high mental grasp and great knowledge of business and of the affairs of the world. Their speculations display talent and forecast, but they act upon their conclusions, and buy or sell in a *bona fide* way." Pages 598, 599. He then adds: "But when such a contract is made as a cover for gambling, without any intention to deliver and receive the grain, but merely to pay and receive the difference between the price agreed upon and the market price at such future day, then it comes within the statute of gaming, and is void in law." Page 599. This left it for the party alleging such gambling contract to prove such facts.

It will be observed that that case did not turn upon a charge of the court as to the burden of proof, as here, nor

upon a ruling as to the admission of evidence. On the contrary, the jury was waived and the case was tried by the court, and came to this court upon the findings of the trial court and the evidence. The conclusion of this court from such findings and evidence, as indicated in the memorandum filed, is summed up by Chief Justice Cole in these words: "It is sufficient to say that the court deems it clearly and satisfactorily proven that in respect to some of the transactions none of the parties intended an actual sale and purchase of the wheat, 'but that the whole thing was to be settled by the payment of differences.'" Three years afterwards this court had occasion to review that case; and with the concurrence of all the members of the court who made that decision, except the late Justice Orton and Chief Justice Ryan, who had since died, it was said that the language quoted stated "the ground for holding the note void in that case." *Wall v. Schneider*, 59 Wis. 354. In that case a judgment based upon a verdict directed in favor of the plaintiff was affirmed on the ground that it appeared from the evidence, "conclusively, that the seller intended in good faith to deliver the commodities sold." I certainly did not then understand, and do not now understand, that this court had held that an executory contract for future delivery was presumptively a gambling contract. Such contracts are constantly being made in respect to all kinds of commodities and in all lines of business. I am unwilling to presume that such contracts are void merely because they relate to transactions upon some board of trade. We may have a suspicion that many of such transactions are entered into without any intent on the part of either party that the commodity contracted for should actually be delivered; and yet all must admit that there are legitimate transactions upon the boards of trade every month, if not every week, amounting to millions. Certainly there is no good ground for presuming that all parties to such transactions are outlaws, nor that the

burden of proof should be upon any to prove their inno-
cence.    The law is no respecter of persons, and in my judg-
ment the law when applied to a given transaction upon the
board of trade is the same as when applied to a like trans-
action occurring elsewhere.

DODGE, J.    I concur in the position and views declared in
the foregoing opinion by the chief justice.